Filed 6/22/15  P. v. Vargas CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ESVIN VARGAS et al.,<br><br>Defendants and Appellants. | B252005<br><br>(Los Angeles County<br>Super. Ct. No. BA374621) |

APPEALS from judgments of the Superior Court of Los Angeles County, Kathleen Kennedy, Judge.  Reversed and remanded.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant, Esvin Vargas.

Jennifer M. Hansen, under appointment by the Court of Appeal, for Defendant and Appellant, Eleazar Arevalo.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Kenneth C. Byrne and Ana R. Duarte, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Esvin Vargas and Eleazar Arevalo were convicted of the murder of Kristian Rodriguez by separate juries following a joint trial. Carlos Hernandez, known by the gang moniker "Listo," was the actual shooter; Vargas and Arevalo were tried on alternate theories that they had directly aided and abetted the murder or that the murder was the natural and probable consequence of the target crime of assault with a firearm, which the two of them had aided and abetted. The jury also found true criminal street gang and firearm-use enhancements as to both Vargas and Arevalo.

On appeal Vargas and Arevalo challenge the sufficiency of the evidence to support their convictions (first degree murder for Vargas; second degree murder for Arevalo) and argue the court's instructions were prejudicially defective due to misstatements in several of the instructions given and because the court failed to instruct sua sponte on certain lesser included offenses. Arevalo also contends statements he made to the police following his arrest should have been excluded as a continuation of an initial involuntary confession, which the court had suppressed in light of the lead detective's improper (false) promises during the interrogation, and argues his sentence of 40 years to life is a de facto sentence of life without the possibility of parole and, as such, constitutes cruel and unusual punishment since he was only 16 years old at the time of the incident. Finally, Vargas and Arevalo ask us to review the sealed transcripts of hearings regarding disclosure of the investigating officer's personnel files and the identity of confidential informants.[1] We reverse both convictions and remand for new trials.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Shooting*

In the late afternoon of January 4, 2010, Rodriguez, one of his friends, Jirair Tossounian, and Rodriguez's mother, Araceli Gutierrez, were standing in front of Gutierrez's home on North Serrano Avenue in Los Angeles. Rodriguez, who was 20 years old, had a short haircut and tattoos on his arms, was five feet, seven or eight

---

[1] As authorized by California Rules of Court, rule 8.200(a)(5), Vargas and Arevalo join in each other's arguments to the extent they are applicable.

inches tall, and weighed between 190 and 195 pounds. He was not a gang member. Rodriguez was reportedly happy about the birth of his child but upset because he had received a fine in traffic court earlier in the day. According to Tossounian , Rodriguez had told him he wanted to get into a fight. Gutierrez testified she was trying to comfort her son when she noticed two Hispanic males riding bicycles slowly down the street in their direction.

Gutierrez described one of the cyclists, who looked 17 or 18 years old, as "chunky"; the other appeared thin and younger. At the time of the shooting Vargas was 18 years old; Arevalo was 16 years old and weighed approximately 110 pounds.

The two cyclists stopped near where Gutierrez, Rodriguez and Tossounian were standing. The chunky individual appeared to say something although Gutierrez did not hear what he said. Rodriguez responded, "You guys fucking disrespecting my mom?" He then walked into the street, notwithstanding Gutierrez's and Tossounian's attempt to stop him, and confronted the two individuals. One of the cyclists threw down his bicycle and said, "MS." A fight started. A third man (Hernandez), who had been standing on the opposite side of the street from Gutierrez and Rodriguez, shot Rodriguez. Rodriguez fell to the ground. The man with the gun took a step toward Rodriguez and shot him again. The two cyclists and the shooter immediately left the area.

Tossounian, testifying for the defense at trial, said the two bicyclists tried to retreat and flee the scene before Rodriguez attacked them. He described Rodriguez to the police as the instigator of the incident and testified that Rodriguez was on top of one of the two cyclists at the time he was shot. According to Tossounian, the shooter was standing on the back axle of one of the bicycles as they rode away.

Rodriguez sustained two gunshot wounds to the chest, one of which was fatal, and a gunshot wound to his right hand (apparently a reentry wound). The bullet in Rodriguez's hand was removed during the autopsy. The parties stipulated this bullet had been fired from a revolver purchased from Christopher Marroquin by law enforcement agents several weeks after the shooting as part of an undercover operation conducted by

the Federal Bureau of Investigation and the Los Angeles County Sheriff's Department. The People's gang expert testified Marroquin was known to be a member of the Harvard Criminals clique of the Mara Salvatrucha criminal street gang.

2. *The Gang Evidence*

Los Angeles Police Detective Timo Illig responded to process the crime scene approximately 40 minutes after the shooting. (Apparently Rodriguez's body had already been removed by paramedics.) Illig observed Mara Salvatrucha gang graffiti (a black painted "MS") on the sidewalk approximately 15 to 20 feet from where he collected bloody clothing lying on the ground. The "MS" had been crossed out and replaced with a white painted "R 13," signifying the rival criminal street gang Rebels 13. There was other gang graffiti nearby for the Hollywood Locos clique of Mara Salvatrucha, as well as Rebels 13 graffiti that had been crossed out.

The People's gang expert, Los Angeles Police Detective Frank Flores, testified the Mara Salvatrucha criminal street gang, which has the common symbol "MS" and is also known as "M.S.," "M.S. 13," and "La Mara," claimed the territory where Rodriguez was killed.[2] The Harvard Criminals clique of Mara Salvatrucha and the Hollywood Locos clique of the gang had almost the same boundaries, and members of the two cliques got along well with each other in January 2010. (Detective Flores described the Harvard Criminals as the "younger brother to the Hollywood clique.") Detective Flores explained that painting over or crossing out the MS gang symbol with the Rebels 13 insignia in an area controlled by Mara Salvatrucha was an act of disrespect. He also testified that gang members protect their territory from another gang's infringement through violence, fear

---

[2] In his testimony Detective Flores provided the basis for the juries' findings that Mara Salvatrucha is a criminal street gang as defined by Penal Code section 186.22, subdivisions (e), (f) and (j), and that the shooting of Rodriguez was committed for the benefit of, at the direction of, or in association with a criminal street gang and with the specific intent to promote, further or assist in criminal conduct by gang members. Neither Vargas nor Arevalo challenges the sufficiency of the evidence to support the criminal street gang enhancement.

4

and intimidation and show their allegiance to their gang by committing acts of violence against rival gang members, which enhances the gang's reputation in the community.

Detective Flores opined that Hernandez, Vargas and Arevalo were all members of Mara Salvatrucha. Vargas and Arevalo each had a number of Mara Salvatrucha gang tattoos, and entries on their social media pages included multiple gang references. Vargas identified himself as "Lil Puppet" and was a member of the Hollywood Locos clique; Arevalo's MySpace page also referred to the Hollywood Locos clique. Both Vargas and Arevalo used the term "chavalas," which means little girl in Spanish but, according to Detective Flores, is employed by gang members as a derogatory term for a rival gang member. (Vargas's MySpace profile also referred to "Rebeccas," which the gang expert testified was a derogatory term specifically directed to Rebels 13.)

In separate testimony before each of the two juries, Detective Flores opined, based on a hypothetical closely approximating the facts in evidence, the shooting of Rodriguez was committed in association with and for the benefit of the Mara Salvatrucha gang. He explained the armed gang member had made it known to the other two members that he was looking for rivals in an area in which their gang's graffiti had been crossed out, showing disrespect. When these gang members then encountered someone they perceived to be a rival who acted disrespectfully (by words and demeanor), the resulting altercation and shooting were the means by which the gang enforced its territory.

3. *Vargas's and Arevalo's Statements to the Police*

Vargas and Arevalo were individually interrogated and made statements to Los Angeles Police Detective Brett Goodkin (through a Spanish language interpreter) following their arrests in August 2010 after being advised pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] of their right to remain silent, to the presence of an attorney, and, if indigent, to appointed counsel. Each interview was audio and video recorded. The recording of Vargas's statement was played and admitted into evidence at trial only against him; Arevalo's statements were played for his jury and admitted into evidence only against him.

5

a. *Vargas's statement*

Vargas told Detective Goodkin he and Arevalo had been standing outside Vargas's house on Sierra Vista Avenue when Listo (Hernandez) arrived.[3] Listo told them he had a gun with him, but he did not pull it out or show it to them. At one point Vargas said they started walking because Arevalo and Listo wanted to buy some marijuana, subsequently because they were going to the liquor store. After further specific questioning by Detective Goodkin, Vargas added that Listo had said he was going to go see or look for chavalas or enemies. Vargas and Arevalo rode their bicycles in the street; Listo followed on the sidewalk on foot.

Vargas continued that, as he and Arevalo rode their bicycles down North Serrano Avenue toward the liquor store, Rodriguez, who was outside with this mother, began yelling at them and wanted to fight. Gutierrez grabbed at Rodriguez and tried to stop him but was unsuccessful. Rodriguez pushed Gutierrez away and continued yelling and coming toward them. At this point Arevalo shouted "Mara Salvatrucha." Rodriguez responded, "Fuck la Mara," and began punching them. Rodriguez threw Vargas to the ground. Vargas got up, but Rodriguez and Arevalo continued struggling on the ground. Vargas was riding away when he saw Listo run up and shoot Rodriguez twice.

Vargas, Arevalo and Hernandez eventually all went to the home of Deysi Argueta, where they stayed until dark. (Detective Flores testified Argueta's boyfriend was a member of the Harvard Criminals clique of Mara Salvatrucha and her home was within the gang's boundaries.) Arevalo left first; then Vargas.

Vargas denied he knew Listo would kill anyone that day and insisted he was upset that Listo had done so. He admitted he was a member of the Hollywood Locos clique of Mara Salvatrucha and acknowledged he had heard Listo bragging about killing someone he believed to be a rival gang member.

---

[3] Sierra Vista Avenue at this location runs east-west for a block and then curves to the south, becoming North Serrano Avenue, where the shooting occurred.

6

b. *Arevalo's statement*

Arevalo, who was 16 years old when Rodriguez was shot, was initially questioned by Detective Goodkin on July 30, 2010, prior to his arrest. That statement, discussed in more detail below, was suppressed as the product of improper (false) promises. After Arevalo's arrest on August 12, 2010 Detective Goodkin again interrogated him through a second officer who both acted as translator and asked his own questions.

Arevalo told the officers he was at Vargas's home on January 4, 2010. They called Listo, who was going to bring marijuana. When Listo arrived, he showed them a gun. While Listo, Vargas and Arevalo were listening to music and talking, Listo said he was going to kill a "chaval."[4] Although the transcript of the three-way exchange among Detective Goodkin, the Spanish-speaking officer and Arevalo does not present a clear narrative, Arevalo ultimately acknowledged that Listo also said he was going to "look for the enemy." Someone then suggested they go for a walk. Arevalo understood they were going to look to see if any of the Mara Salvatrucha graffiti in the neighborhood had been crossed out again by members of Rebels 13.

With Listo walking on "the other side," Vargas and Arevalo rode their bicycles in the street down North Serrano Avenue where they encountered Rodriguez. Rodriguez stared at them, and Vargas asked what he was looking at. Rodriguez came over and started arguing with Vargas. Vargas threw his bicycle toward Rodriguez and yelled La Mara Salvatrucha. Rodriguez responded by throwing the bicycle toward Arevalo and then pushed Arevalo and jumped on him. Listo came over, pushed Arevalo aside and shot Rodriguez twice.

According to Arevalo, after the shooting they all ran toward the nearby park. Once there, Listo gave the gun to Arevalo to hold while Listo vomited and then took it back. Ultimately they went to Argueta's house, where they stayed for the balance of the

---

[4] Although the transcript indicates Arevalo used the word "chaval," which means a young boy, the Spanish-speaking officer acting as translator for Detective Goodkin told Goodkin that Arevalo had said "chavala," which, as discussed, literally means young girl but is employed as a derogatory term by gang members for their rivals.

day. Arevalo also told the officers that Listo had bragged about killing a chaval at a meeting of the Hollywood Locos clique of Mara Salvatrucha.

4. *The Court's Instructions on Aiding and Abetting*

Vargas and Arevalo were tried on alternate theories that they had directly aided and abetted the murder or that the murder was the natural and probable consequence of the target crime of assault with a firearm, which the two of them had aided and abetted. The court instructed the juries with CALCRIM Nos. 400, 401 and 403 explaining the difference between directly committing a crime and aiding and abetting the perpetrator of the crime (400), the elements of direct aiding and abetting (401) and the natural and probable consequences theory of aiding and abetting (403). Assault with a firearm was identified as the target offense for the natural and probable consequence theory and was defined in CALCRIM No. 875. The court used CALCRIM No. 500 and modified versions of CALCRIM Nos. 520, 521 and 522 to define homicide and murder and explain the differences between first degree and second degree murder. The juries were also instructed pursuant to CALCRIM No. 505 that Vargas and Arevalo were not guilty of murder as aiders and abettors if the shooter was justified in killing someone in defense of another and pursuant to CALCRIM No. 571 that a killing that would otherwise be murder is reduced to voluntary manslaughter if the shooter was acting in imperfect defense of another.

5. *The Verdict and Sentencing*

Vargas was convicted of first degree murder. A separate jury convicted Arevalo of second degree murder. Each jury found true special firearm-use and criminal street gang allegations pursuant to Penal Code sections 12022.53, subdivisions (d) and (e)(1), and 186.22, subdivision (b). Vargas was sentenced to an aggregate indeterminate term of 50 years to life; Arevalo to an aggregate indeterminate term of 40 years to life. The court

8

awarded Vargas 1,335 days and Arevalo 1,141 days of presentence custody credit and imposed statutory fees, fines and assessments.[5]

## DISCUSSION

1. *The Trial Court's Instruction Permitting Vargas To Be Convicted of First Degree Murder Under the Natural and Probable Consequences Doctrine Was Prejudicial Error*

In *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), decided after Vargas filed his opening brief in this appeal, the Supreme Court held "an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles." (*Id.* at pp. 158-159.) The Attorney General concedes, in light of *Chiu*, the trial court erred in giving instructions that permitted the jury to convict Vargas of first degree murder under the natural and probable consequences doctrine but contends Vargas was not prejudiced by the improper instruction. The Attorney General's argument, which simply asks us to weigh the evidence indicating Vargas directly aided and abetted Listo (and Arevalo) in the murder of Rodriguez, fundamentally misconceives the required harmless error analysis.

As the Court explained in *Chiu*, "There are two distinct forms of culpability for aiders and abettors. 'First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also "for any other offense that was a 'natural and probable consequence' of the crime aided and abetted."'"[6] (*Chiu,*

---

[5]     The court also ordered Vargas and Arevalo to pay $12,460.38 in direct victim restitution to the Victim Compensation and Government Claims Board. (Pen. Code, § 1202.4, subd. (f).) The court made this obligation joint and several as reflected in the transcript of the sentencing hearing and the subsequent minute order. As Vargas and Arevalo note, and the Attorney General acknowledges, however, the abstract of judgment does not correctly report the joint and several nature of the obligation.

[6]     Under the natural and probable consequences doctrine, "'"[a] person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target

9

*supra,* 59 Cal.4th at p. 158.) "First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty. [Citation.] That mental state is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death. [Citations.] . . . Although we have stated that an aider and abettor's 'punishment need not be finely calibrated to the criminal's mens rea' [citation], the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved and the above-stated public policy concern of deterrence." (*Id.* at p. 166.) For these reasons, the Court held "that punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine. We further hold that where the direct perpetrator is guilty of first degree premeditated murder, the legitimate public policy considerations of deterrence and culpability would not be served by allowing a defendant to be convicted of that greater offense under the natural and probable consequences doctrine." (*Ibid*.)

Nonetheless, "[a]iders and abettors may still be convicted of first degree premeditated murder based on direct aiding and abetting principles. [Citation.] Under those principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission.

---

offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime.'" [Citation.] 'Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault.'" (*Chiu, supra,* 59 Cal.4th at p. 161.)

[Citation.] Because the mental state component—consisting of intent and knowledge—extends to the entire crime, it preserves the distinction between assisting the predicate crime of second degree murder and assisting the greater offense of first degree premeditated murder. [Citations.] An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent. Such an aider and abettor, then, acts with the mens rea required for first degree murder." (*Chiu, supra,* 59 Cal.4th at pp. 166-167.)

In *Chiu* the Court reversed the first degree murder conviction of a teenage defendant who had instigated a fight that resulted in murder; according to disputed testimony, the defendant had told his friend to grab the gun and shoot the victim. (*Chiu, supra,* 59 Cal.4th at p. 160.) The People pursued the defendant's conviction for first degree premeditated murder under a direct aiding and abetting theory, as well as a natural and probable consequences theory; and the trial court instructed the jury it could convict the defendant of first degree murder if it found he either directly aided and abetted the murder or aided and abetted the target offense of assault, the natural and probable consequence of which was murder. (*Ibid.*) Finding the trial court had erred in instructing the jury on the natural and probable consequences doctrine, the Court turned to the issue of prejudice: "When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground. [Citation.] Defendant's first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that the defendant directly aided and abetted the premeditated murder." (*Id*. at p. 167.)[7] Because the record

---

[7]  In discussing the question of prejudice the *Chiu* Court cited its earlier decision on the issue in *People v. Chun* (2009) 45 Cal.4th 1172, 1203-1205, in which the Court had explained, "[w]ithout holding that this is the only way to find error harmless," reversal for instructional error is not proper "'if the jury verdict on other points effectively

11

indicated the jury may have relied on the natural and probable consequences doctrine in convicting the defendant, the Court reversed because it could not conclude beyond a reasonable doubt the jury had relied on a legally valid theory. (*Id*. at p. 168.)

The Attorney General points to nothing in the record that affirmatively indicates the jury relied upon the direct aiding and abetting theory, rather than the natural and probable consequences doctrine, to convict Vargas of first degree premeditated murder. Certainly none of the jury's other findings—that is, its true findings as to the criminal street gang or firearm-use enhancements—necessarily embraces an implied finding that Vargas directly aided and abetted the murder or is inconsistent with its use of the natural and probable consequences doctrine. (See *People v. Chun* (2009) 45 Cal.4th 1172, 1203-1205.) Instead, the Attorney General argues the strength of the evidence that Vargas directly aided and abetted Listo in committing murder, together with the fact the prosecutor "focused" his argument on the direct aiding and abetting theory (although discussing both theories in his jury argument), supports a finding beyond a reasonable doubt the jury based its verdict on the legally valid theory rather than the erroneous one.

Our review of the record leaves us far from as confident as the Attorney General purports to be about the basis for the jury's first degree murder verdict. While the evidence is sufficient to support a finding Vargas directly aided and abetted an intentional, premeditated murder, as discussed below, there is also ample evidence from which the jury could have concluded his intent was only to assist the aggravated assault of a rival gang member, an act that ultimately led to Rodriguez's death. Indeed, because Listo's use of a firearm to assault a rival gang member would likely result in the victim's death, under the erroneous natural and probable consequence instruction the jury did not need to resolve the question of Vargas's actual intent (that is, did he intend to assist Listo in killing or only assaulting someone). Nothing in the record suggests it did or demonstrates beyond a reasonable doubt the jury based its verdict on the legally valid,

embraces this one or if it is impossible, upon the evidence, to have found what the verdict *did* find without finding this point as well.'" (*Id.* at p. 1204.)

12

direct aiding and abetting theory.  (See *Neder v. United States* (1999) 527 U.S. 1, 15 [119 S.Ct. 1827, 144 L.Ed.2d 35]; *People v. Gonzalez* (2012) 54 Cal.4th 643, 663.)

As the *Chiu* Court explained, the appropriate remedy for this instructional error in many situations is to reverse the first degree murder conviction and allow the People either to accept a reduction of the conviction to second degree murder or to retry the greater offense under a direct aiding and abetting theory.  (*Chiu, supra*, 59 Cal.4th at p. 168.)  In this case, however, other prejudicial instructional error, discussed below, precludes acceptance of a reduction of Vargas's conviction to second degree murder and requires a retrial.

2. *The Failure To Instruct on Heat-of-Passion/Sudden-Quarrel Voluntary Manslaughter as a Lesser Included Offense of Murder Was Prejudicial Error*

a. *The court's obligation to instruct on lesser included offenses*

The trial court has a duty to instruct the jury sua sponte on all lesser included offenses if there is substantial evidence from which a jury can reasonably conclude the defendant committed the lesser, uncharged offense, but not the greater.  (*People v. Whalen* (2013) 56 Cal.4th 1, 68; *People v. Rogers* (2006) 39 Cal.4th 826, 866.)  The duty exists even when the lesser included offense is inconsistent with the defendant's own theory of the case and the defendant objects to the instruction.  (*People v. Banks* (2014) 59 Cal.4th 1113, 1160, disapproved on other grounds in *People v. Scott* (June 8, 2015, S064858) __ Cal.4th __ [2015 Cal. Lexis 3903]; *People v. Breverman* (1998) 19 Cal.4th 142, 155.)  "[I]n a murder prosecution," a court's duty to instruct sua sponte "includes the obligation to instruct on every supportable theory of the lesser included offense of voluntary manslaughter, not merely the theory or theories which have the strongest evidentiary support, or on which the defendant has openly relied."  (*Breverman,* at p. 149; accord, *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)  This instructional requirement "'prevents either party, whether by design or inadvertence, from forcing an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other.  Hence, the rule encourages a verdict, within the charge chosen by the prosecution, that is neither "harsher [n]or more lenient than the evidence

13

merits."'"'" (*People v. Smith* (2013) 57 Cal.4th 232, 239-240; accord, *Banks,* at p. 1160; *People v. Campbell* (2015) 233 Cal.App.4th 148, 162.)

We review the trial court's failure to instruct on a lesser included offense de novo (see *People v. Licas* (2007) 41 Cal.4th 362, 367; *People v. Manriquez* (2005) 37 Cal.4th 547, 581) considering the evidence in the light most favorable to the defendant (*People v. Millbrook, supra,* 222 Cal.App.4th at p. 1137; *People v. Turk* (2008) 164 Cal.App.4th 1361, 1368, fn. 5).

   b. *Voluntary manslaughter as a result of a sudden quarrel or heat of passion*

An intentional unlawful homicide is a voluntary manslaughter stemming from a sudden quarrel or heat of passion if the defendant acted through strong passion aroused by a provocation sufficient to cause an ordinary person to act without due deliberation and reflection. (*People v. Breverman, supra*, 19 Cal.4th at p. 163.) Voluntary Manslaughter based upon a sudden quarrel or heat of passion has an objective and a subjective component. Under the subjective component, the defendant must actually have killed under the immediate influence of the provocation. Under the objective component, the circumstances giving rise to the act must be objectively sufficient to provoke an ordinarily reasonable person to act rashly and without deliberation. (*People v. Enraca* (2012) 53 Cal.4th 735, 759.) No specific type of provocation is necessary; the passion can be anger, rage or any violent or intense emotion other than revenge: "To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene." (*People v. Beltran* (2013) 56 Cal.4th 935, 949.) The victim, not the defendant, must have initiated the provocation that incited the killing. (*Breverman*, at p. 163; *People v. Carasi* (2008) 44 Cal.4th 1263, 1306.)

During a hearing on jury instructions, after discussing the instructions that would be given on defense of others and imperfect defense of others, Arevalo's counsel

requested an instruction on voluntary manslaughter/heat of passion, explaining, "The theory for manslaughter, based on these guys and Carlos Hernandez [(Listo)], is that [Listo] becomes so agitated and inflamed when he sees his littles being beaten down, that he responds not in defense of his littles but in an – emotionally, sort of heat of passion." The court inquired, "How do you make a distinction between acting in defense of others or in imperfect defense of others, and then you are just saying well he is angry because his buddies are being beaten up?  I mean, that becomes ridiculous."  Although counsel for Arevalo then agreed with the court—"No, no.  You are right.  You are right."—we do not.  The failure to give a voluntary manslaughter heat-of-passion/sudden quarrel instruction was prejudicial error.

Notwithstanding the trial court's view (and defense counsel's apparent agreement),[8] in the context of this case the difference between voluntary manslaughter based on imperfect defense of another and voluntary manslaughter based on a sudden quarrel is anything but "ridiculous."  To have reduced the crime from murder to manslaughter based on imperfect defense of others, the jury would have had to find, even though there was no evidence Rodriguez had a weapon of any sort when he fought with Vargas and Arevalo, that Listo actually believed the immediate use of deadly force was necessary to protect Arevalo from imminent danger of being killed or suffering great bodily injury.  (See *People v. Randle* (2005) 35 Cal.4th 987, 997, overruled in part on other grounds in *People v. Chun, supra*, 45 Cal.4th at p. 1201; see also *People v. Booker* (2011) 51 Cal.4th 141, 182.)  In contrast, to reduce the offense to voluntary manslaughter based on sudden quarrel, the jury had only to conclude the combination of Rodriguez's belligerent demeanor, verbal insult of the Mara Salvatrucha gang, initiation of a physical

---

[8]    Although after requesting the sudden quarrel/heat-of-passion voluntary manslaughter instruction defense counsel concurred with the trial court's decision not to give it, the doctrine of invited error is inapplicable here:  Counsel did not "persuade" the trial court not to instruct on a lesser included offense supported by the record.  (See *People v. Barton* (1995) 12 Cal.4th 186, 198 [explaining limited role of invited error doctrine in challenge to trial court's failure to instruct sua sponte on lesser included offense].)

15

confrontation with the two bicyclists and forcible subduing of Arevalo, a youngster 80 to 85 pounds lighter than Rodriguez, was sufficient to cause an ordinarily reasonable person to act rashly and, in fact, provoked Listo into shooting (even though he may not have believed use of deadly force was necessary). (See *People v. Thomas* (2013) 218 Cal.App.4th 630, 645 [even when facts "fit more precisely with a homicide mitigated by imperfect self-defense, . . . they may also show that [defendant] was guilty only of voluntary manslaughter because when he shot [the victim] his passion was aroused and his reason was obscured due to a sudden quarrel"].)

Of course, a jury may not have accepted that version of events; but the evidence in the record, viewed in the light most favorable to Vargas and Arevalo, was sufficient to trigger the trial court's obligation to instruct on voluntary manslaughter based on sudden quarrel as a lesser included offense of murder. (See *People v. Millbrook, supra*, 222 Cal.App.4th at pp. 1141-1142 [sudden quarrel instruction required based on victim's belligerent and threatening behavior]; *People v. Ramirez* (2010) 189 Cal.App.4th 1483, 1484-1488 [shooting preceded by fight among rival gang members; prejudicial error not to give sudden quarrel/heat-of-passion instruction]; see generally *People v. Elmore* (1914) 167 Cal. 205, 211 [fight that escalated into killing supported verdict of voluntary manslaughter not murder].) Indeed, "'[i]n the usual case,'" a sudden quarrel or heat-of-passion instruction "'supplements the self-defense instruction.'" (*People v. St. Martin* (1970) 1 Cal.3d 524, 531; see *Breverman, supra*, 19 Cal.4th at pp. 148, 162-164 [error not to give heat-of-passion instruction when jury instructed on both complete and imperfect self defense].)

c. *The instructional error was prejudicial*

"[W]hen a trial court violates state law by failing to properly instruct the jury on a lesser included offense, this test applies: '[I]n a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*People v.*] *Watson* [(1956) 46 Cal.2d 818, 836]. A conviction of the charged offense

16

may be reversed in consequence of this form of error only if, "after an examination of the entire cause, including the evidence" (Cal. Const., art. VI, § 13), it appears "reasonably probable" the defendant would have obtained a more favorable outcome had the error not occurred.'" (*People v. Lasko* (2000) 23 Cal.4th 101, 111; see *People v. Beltran, supra*, 56 Cal.4th at p. 955; see also *People v. Moye* (2009) 47 Cal.4th 537, 556.)

Here, the evidence that Listo acted dispassionately in shooting Rodriguez after Rodriguez had provoked a fight with Vargas and Arevalo and while Rodriguez was on top of, and apparently pummeling, the much smaller and younger Arevalo, was at most equivocal. Even though the juries believed Vargas and Arevalo had knowingly escorted Listo as he walked the neighborhood looking for a rival to assault, intending to help him in that quest, it is reasonably probable on this record—and in light of the fact that Rodriguez was the initial aggressor and neither defendant was armed, let alone the actual shooter—a properly instructed jury would have found that Listo committed only voluntary manslaughter, and thus their crimes, too, were voluntary manslaughter. Alternatively, even if Listo committed murder, the jury may well have concluded that voluntary manslaughter, rather than murder, was the natural and probable consequence of Vargas and Arevalo's actions in aiding him—that they should have anticipated that stalking a gang rival could lead to the type of fight that escalates and results in a death. (See, e.g., *People v. Woods* (1992) 8 Cal.App.4th 1570, 1593 ["Even when lesser offense instructions are not required for the perpetrator because the evidence establishes that, if guilty at all, the perpetrator is guilty of the greater offense, the trial court may have a duty to instruct sua sponte on necessarily included offenses as to aider and abettor liability. If the evidence raises a question whether the offense charged against the aider and abettor is a reasonably foreseeable consequence of the criminal act originally aided and abetted but would support a finding that a necessarily included offense committed by the perpetrator was such a consequence, the trial court has a duty to instruct sua sponte on the necessarily included offense as part of the jury instructions on aider and abettor liability.

17

Otherwise, . . . the jury would be given an unwarranted, all-or-nothing choice concerning aider and abettor liability."].)

Citing to and quoting from *People v. Wharton* (1991) 53 Cal.3d 522, 572, the Attorney General argues at least as to Vargas, by finding him guilty of first degree, premeditated murder, his jury necessarily found Rodriguez's shooting did not result from a sudden quarrel or heat of passion and any error in failing to instruct on this theory of voluntary manslaughter was harmless. The Attorney General accurately quotes the following language from page 572 of the *Wharton* opinion: "By finding defendant was guilty of first degree murder, the jury necessarily found defendant premeditated and deliberated the killing. This state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion—even if that state of mind was achieved after a considerable period of provocatory conduct—and clearly demonstrates that defendant was not prejudiced by the failure to give his requested instruction." The Attorney General omits, however, information from the preceding paragraphs in which the Court explained the jury, in fact, had been "given comprehensive instructions on provocation and heat of passion" (*id*. at p. 572), and the issue in the case was not whether it was harmless error to omit such instructions entirely but rather whether the defendant was prejudiced by the trial court's error in declining to give a requested pinpoint instruction that legally adequate provocation could occur over a "considerable period of time." (*Id*. at pp. 570-571.) The recent decision from the First District, *People v. Peau* (2015) 236 Cal.App.4th 823, which applied *Wharton* and held the defendant's conviction of first degree murder rendered any failure to give a heat of passion instruction harmless, similarly fails to accord any significance to the difference between the error in *Wharton* in declining to give a requested pinpoint instruction and the complete omission of the heat of passion voluntary manslaughter instruction. (See *id*. at pp. 830-832.)

In *People v. Berry* (1976) 18 Cal.3d 509, 518, on the other hand, the Supreme Court held, when, as here, there was only a passing reference to heat of passion and

18

provocation for the purpose of distinguishing first degree and second degree murder, but not as a basis for finding voluntary manslaughter, "the jury's determination that defendant was guilty of murder of the first degree under the instructions given did not necessarily indicate that 'the factual question posed by the omitted instruction [concerning heat-of-passion voluntary manslaughter] was necessarily resolved adversely to the defendant under other, properly given instructions' [citation]—in other words that the jury had found that defendant had not killed [the victim] under a heat of passion." The *Berry* Court found the failure to instruct on voluntary manslaughter was prejudicial error under *Watson*. Our colleagues in Division One of this court followed *Berry* in *People v. Ramirez, supra*, 189 Cal.App.4th 1483 when, in reversing a first degree murder conviction arising from a gang fight and shooting, it explained, "[T]he Supreme Court has held that the erroneous omission of an instruction on heat of passion voluntary manslaughter is not rendered harmless by a jury determination that the defendant was guilty of first degree murder rather than second degree murder." (*Id*. at p. 1488.) *Berry*'s analysis, not *Wharton*'s, is applicable here.

### 3. *The Instruction on the Target Offense of Assault with a Firearm Was Incorrect and Must Be Corrected on Retrial*

As discussed, the jury was instructed pursuant to CALCRIM No. 403 as to the natural and probable consequences theory of aiding and abetting. In part the jury was told, "This theory requires that before you may decide whether the defendant is guilty of murder, you must decide whether he is guilty of assault with a firearm. Assault with a Firearm is defined in Instruction 875. [¶] To prove that the defendant is guilty of murder, the People must prove that: [¶] 1. The defendant is guilty of assault with a firearm; [¶] 2. During the commission of assault with a firearm a coparticipant in that assault with a firearm committed the crime of murder; [¶] AND [¶] 3. Under all of the circumstance, a reasonable person in the defendant's position would have known that the commission of the murder was a natural and probable consequence of the commission of

19

the assault with a firearm.[9] [¶] A coparticipant in a crime is the perpetrator or anyone who aided and abetted the perpetrator. . . ."

To instruct on the elements of assault with a firearm as the target offense, the court modified CALCRIM No. 875 by adding the phrase "as an aider and abettor" in the introductory statement and substituting "co-participant" for "defendant" in each of the five numbered elements of the offense. As modified the court instructed, "To prove that the defendant is guilty of this crime [assault with a firearm] as an aider and abettor, the People must prove that: [¶] 1. The co-participant did an act with a firearm that by its nature would directly and probably result in the application of force to a person; [¶] 2. The co-participant did that act willfully; [¶] 3. When the co-participant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; [¶] AND [¶] 4. When the co-participant acted, he had the present ability to apply force with a firearm to a person; AND [¶] 5. The co-participant did not act in defense of someone else. . . ."

CALCRIM No. 875, as modified, did not instruct the jury that, to find Vargas or Arevalo guilty of the target offense (aggravated assault) as aiders and abettors, it had to find they had committed any criminal act or possessed any specific, culpable mental state. The jury only had to find that a "coparticipant" (that is, Listo) committed the aggravated assault and was not acting in their defense when he did so. The instruction, therefore, improperly removed a necessary element of the target crime from the jury's consideration.

The Attorney General implicitly concedes the modified version of CALCRIM No. 875 was flawed. Nonetheless, emphasizing the well-established rule that we review a claim of instructional error based on a review of the instructions as a whole in light of the entire record, not in isolation (see, e.g., *People v. Lucas* (2014) 60 Cal.4th 153, 282;

---

[9] Even though the court instructed on voluntary manslaughter based on imperfect self defense, it did not give the jury the option of convicting Vargas or Arevalo of voluntary manslaughter as a natural and probable consequence of having aided and abetted the target offense of aggravated assault.

20

*People v. Harrison* (2005) 35 Cal.4th 208, 252), she contends, when read together, CALCRIM Nos. 403 and 875 properly informed the jury regarding Vargas and Arevalo's liability as aiders and abettors under the natural and probable consequences doctrine.[10] Specifically, the Attorney General argues, the two instructions told the jury Vargas and Arevalo were guilty of murder under the natural and probable consequences doctrine if they intended to encourage or aid the commission of the assault with a firearm (the target offense). They do not.

Whether considered separately or jointly, neither instruction informed the jury Vargas and Arevalo were guilty of murder under the natural and probable consequences doctrine only if the People proved beyond a reasonable doubt that they were guilty of aiding and abetting Listo's aggravated assault against Rodriguez and the death of Rodriguez was a reasonably foreseeable outcome of that target offense. To the contrary, the jury was simply told in CALCRIM No. 403 each defendant was guilty of murder if he was guilty of aggravated assault—referring the jury to CALCRIM No. 875 alone for the definition of the elements of that target offense—and Rodriguez's death was a reasonably foreseeable consequence of the aggravated assault. CALCRIM No. 875, in turn, instructed (incorrectly) that each defendant was guilty of aggravated assault if a coparticipant (that is, Listo) committed that predicate crime. There was no instruction the jury had to find either Vargas or Arevalo intended to encourage or facilitate the commission of the target offense or in any manner aided, promoted or encouraged Listo's

---

[10]     The Attorney General argues this claim has been forfeited because no objection to CALCRIM No. 875 as modified was made by defense counsel in the trial court, citing cases that state a party may not argue on appeal that an instruction correct in law was too general or incomplete without first requesting a clarification in the trial court. But the argument here is that the instruction was not "correct in law"; to the contrary, it omitted a necessary element of the target offense. The Supreme Court in *People v. Hillhouse* (2002) 27 Cal.4th 469, 503, a case quoted by the Attorney General to support the forfeiture claim, expressly limits the general rule in the circumstances presented here, explaining in the same paragraph as the language quoted in the Attorney General's brief, "Instructions regarding the elements of the crime affect the substantial rights of the defendant, thus requiring no objection for appellate review."

commission of that offense. (See generally *People v. Prettyman* (1996) 14 Cal.4th 248, 262 [defining elements of natural and probable consequences doctrine].) Although the introductory language used by the court when giving CALCRIM No. 875 referred to Vargas and Arevalo's liability as aiders and abettors, nothing in either CALCRIM Nos. 403 or 875 explained what that meant or what the jury needed to find for them to be liable as aiders and abettors.

To be sure, CALCRIM No. 401, given in connection with the alternate theory that Vargas and Arevalo had directly aided and abetted Listo's murder of Rodriguez, accurately described the necessary elements for aiding and abetting liability. But the court's instructions carefully distinguished between the two aiding and abetting theories, and nothing in CALCRIM Nos. 403 or 875 suggested that CALCRIM No. 401's enumeration of elements was also to be considered in determining liability under the natural and probable consequences doctrine. Nonetheless, particularly astute jurors might have recognized the flaw in the literal requirements for a conviction under CALCRIM Nos. 403 and 875 and themselves looked to CALCRIM No. 401 to supply the missing elements for aiding and abetting liability. Indeed, we assume jurors are intelligent individuals, capable of understanding and correlating all the instructions. (See *People v. Sattiewhite* (2014) 59 Cal.4th 446, 475; *People v. Richardson* (2008) 43 Cal.4th 959, 1028.) In addition, in closing argument to both juries, the prosecutor indicated Vargas and Arevalo were guilty of murder even if they did not know Listo intended to kill someone but murder was the natural and probable consequence of an aggravated assault, which they intended to assist. (See *People v. Young* (2005) 34 Cal.4th 1149, 1202 ["reviewing court also must consider the arguments of counsel in assessing the probable impact of the [potentially misleading] instruction on the jury"].)

Under the circumstances the instructional error regarding the target offense might well be harmless. We need not decide that issue, however; for our reversal of Vargas's and Arevalo's convictions based on the failure to instruct on heat-of-passion/sudden-

22

quarrel voluntary manslaughter renders it moot. Upon retrial, the instructions regarding the target offense must be corrected.

4. *Arevalo's August 12, 2010 Statements Should Have Been Suppressed as a Continuation of His Earlier Involuntary Confession*

a. *Arevalo's statements to Detective Goodkin*

Arevalo was 17 years old in late July 2010 when he was initially interrogated about the Rodriguez shooting by Detectives Goodkin and Chris Gable (with Officer Jeff Castillo acting as translator) after being advised of his rights under *Miranda* and agreeing to answer questions. Arevalo was not under arrest.

Midway through the interview, which had not produced any significant information, the detectives brought in Arevalo's father, who spoke to his son outside the officers' presence and urged him to tell the truth. The detectives then returned, and Arevalo's father remained in the room. Goodkin told Arevalo, "My partner and I don't wanna book you for murder. If we had a hard on to do that we would've booked you already. Okay? We just think you're a wit[ness]." Arevalo was promised that, if he told the truth and admitted he was at the scene, he could go home with his father, who, the detectives said, wanted him to "man up and tell the truth." Arevalo's father then asked him if the gang was worth more to him than his own father.

Arevalo was also told, if he identified the shooter, he and his family would be relocated at the City's expense. According to Detective Gable, "If you're worried about saying, 'Hey, this person shot someone,' which is understandable . . . we do this all the time, if and when that time comes, and we already explained this to your father, the City will pay to relocate you and your family to another safe location before you would ever have to do that." Arevalo then revealed he was involved in a fistfight with Rodriguez, who he believed was a rival gang member at the time of the shooting, and identified photographs of Listo as the shooter and Vargas as the other person riding a bicycle. Arevalo asked, "This is going to stay here, right?" and Gable answered, "Yes." Arevalo continued, "I did my part"; and Gable responded, "You did. You did good," and

23

Goodkin affirmed, "you did do your part." Arevalo was not arrested and left with his father.

Less than two weeks later Arevalo was arrested and again interrogated by Detective Goodkin after being informed of his constitutional rights and agreeing to speak to the detective. Goodkin's first words were, "Hey, Eleazar," and then, "Okay. Eleazar, you remember me, right? Okay." Arevalo briefly acknowledged the detective, who continued, "And we talked, uh, was it last week with your dad. And, uh, my partner and I, Detective Gable, we told you then that we might have a couple of more questions for you, okay?" Arevalo answered, "yes." Goodkin then proceeded, "Now going back to that day where Listo shot that kid . . . ." The questioning then probed the events preceding the shooting as well as the details of the shooting incident itself. Arevalo again admitted his involvement in the fight leading to Rodriguez's death and described his actions following the shooting, as discussed above in the factual background section of this opinion.

b. *The court's rulings suppressing the first and allowing the second statement*

Arevalo's counsel moved to suppress both statements as involuntary because they had been induced by the detectives' false promises that Arevalo would not be charged in the shooting if he cooperated and that he and his family would be relocated to protect them if he was needed as a witness. The court agreed as to the initial statement: "Goodkin is a problem. He is a problem detective, it seems to me. His tactics are questionable at best. And here in this case I don't feel that those statements again and again and again that he makes to the defendant throughout that interview can be or should be somehow put in a basket over here and not considered, . . . and I don't feel that this was a voluntary statement in light of the inducements and promises that . . . were made and repeated by the detective during the questioning of the defendant. So this statement is suppressed."

The court denied the motion to suppress the second statement, finding there was sufficient attenuation under *People v. McWhorter* (2009) 47 Cal.4th 318 (*McWhorter*),

24

even though both interrogations had been conducted by the same detective. The court noted that Arevalo was under arrest and had been again given his *Miranda* warnings before the second interview. With respect to Detective Goodkin, the court emphasized, "He doesn't make any of the kind of statements that he made in the last interview about 'be a man,' and you know, 'you're going to go home and we'll relocate you,' and we'll do this and we'll do that. And so I am not going to suppress interview No. 2."

After trial Arevalo's counsel again raised the issue of the voluntariness of this confession as part of a motion for new trial. That motion was denied.

c. *Governing law*

In general, a defendant's confession or admission is involuntary, and thus subject to exclusion at trial, only if it is the product of coercion or, more generally, "overreaching." (*People v. Tully* (2012) 54 Cal.4th 952, 992, fn. 13; *People v. Williams* (1997) 16 Cal.4th 635, 659.) "[I]nvoluntariness requires coercive activity on the part of the state or its agents; and such activity must be, as it were, the 'proximate cause' of the statement in question, and not merely a cause in fact." (*People v. Mickey* (1991) 54 Cal.3d 612, 648; accord, *Tully*, at p. 992, fn. 13.) In deciding the question of voluntariness both the United States and California Supreme Courts require courts to apply a "totality of the circumstances" test. (*Withrow v. Williams* (1993) 507 U.S. 680, 693-694 [113 S.Ct. 1745, 1754, 123 L.Ed.2d 407]; *People v. Massie* (1998) 19 Cal.4th 550, 576; *Williams*, at p. 660.) "Relevant are 'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.'" (*Williams*, at p. 660.)

Evidence a defendant's admissions were preceded by express or implied promises of leniency is significant in evaluating whether the statements were voluntary. (*People v. Neal* (2003) 31 Cal.4th 63, 84 ["[p]romises and threats traditionally have been recognized as corrosive of voluntariness"]; *People v. Boyette* (2002) 29 Cal.4th 381, 412 ["[a] promise to an accused that he will enjoy leniency should he confess obviously implicates

25

the voluntariness of any resulting confession"].)  The presence of such a threat or promise, however, is not necessarily determinative:  "[U]nder current law, no single factor is dispositive in determining voluntariness . . . ." (*People v. Williams, supra,* 16 Cal.4th at  p. 661; see *People v. Massie, supra,* 19 Cal.4th at p. 576 ["[i]n determining whether a confession was voluntary, '[t]he question is whether defendant's choice to confess was not "essentially free" because his will was overborne'"].)

The necessary analysis is different, however, when a court is evaluating the admissibility of a statement or confession that, standing alone, might be considered voluntary, but was preceded by a confession that itself was the product of police overreaching.  In *McWhorter, supra*, 47 Cal.4th 318 the Supreme Court held "'where—as a result of improper police conduct—an accused confesses, and subsequently makes another confession, it may be presumed the subsequent confession is the product of the first because of the psychological or practical disadvantages of having "'let the cat out of the bag by confessing.'"'" (*Id.* at p. 359.)  A subsequent confession, however, may be admitted if it is sufficiently attenuated from the prior involuntary confession.  "'The degree of attenuation that suffices to dissipate the taint "requires at least an intervening independent act by the defendant or a third party" to break the causal chain in such a way that the second confession is not in fact obtained by exploitation of the [primary] illegality.'" (*Id.* at p. 360, quoting *People v. Sims* (1993) 5 Cal.4th 405, 444-445.) Indications of attenuation include whether the defendant was given *Miranda* warnings at the start of the second interview, the time between the two interviews, the continuity of personnel between the two interviews, any attempts to exploit information obtained from the first interview in the second interview, whether the defendant was mature and sophisticated, and the defendant's purpose in making his statements in the second interview. (*McWhorter,* at p. 361.)

"'In reviewing the voluntary character of incriminating statements, "'[t]his court must examine the uncontradicted facts surrounding the making of the statements to determine independently whether the prosecution met its burden and proved that the

26

statements were voluntarily given without previous inducement, intimidation or threat.'"'" (*McWhorter, supra*, 47 Cal.4th at p. 346; accord, *People v. McCurdy* (2014) 59 Cal.4th 1063, 1086 [on appeal the trial court's findings as to circumstances surrounding the confession are upheld if supported by substantial evidence but the finding as to the voluntariness of the confession is subject to independent review].)

d. *Arevalo's incriminating statements during the second interview by Detective Goodkin should have been suppressed*

Several of the attenuation factors identified in *McWhorter* are present here. Nearly two weeks had elapsed between the first and second interrogations; Arevalo was given *Miranda* warnings at the start of the second interview; and he had now been arrested, which was inconsistent with the promises given at the first session that had improperly induced his initial statements. However, as the trial court noted, the same detective conducted both interrogations; and, significantly, Detective Goodkin expressly declared the second interview a continuation of the first ("Eleazar, you remember me, right? . . . My partner and I, Detective Gable, we told you then that we might have a couple of more questions for you, okay?") and directly exploited the incriminating information Arevalo had provided in his first confession ("Now going back to that day where Listo shot that kid"). Although Detective Goodkin did not repeat the false promises concerning witness relocation that had infected the initial interrogation, he did nothing to retract them or to explain to Arevalo that his cooperation was no longer a path to freedom.

Moreover, in evaluating the totality of the circumstances we give special consideration to Arevalo's youth (17 years old at the time of the two interrogations), his lack of any prior arrest record or known involvement with the criminal justice system, and the fact he was born in Guatemala and apparently only recently came to the United States. (See *McWhorter, supra*, 47 Cal.4th at p. 361 [court properly considers whether "defendant's 'maturity and ability to again handle himself in a fashion that reflects maturity and sophistication and articulation' served to cleanse any taint"]; see also *Fare v. Michael C.* (1979) 442 U.S. 707, 725 [99 S.Ct. 2560, 61 L.Ed.2d 197] [the

determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation; "[t]he totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights."]; see generally *J.D.B. v. North Carolina* (2011) 564 U.S. ___, ___ [131 S.Ct. 2394, 2398, 180 L.Ed.2d 310, 317] ["children 'generally are less mature and responsible than adults,' . . . they 'often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them,' [citation] and they 'are more vulnerable or susceptible to . . . outside pressures' than adults"].) Although after reading the transcripts of Arevalo's two interrogations the trial court commented, "He doesn't seem like he doesn't know what was going on in this interview, or where he is or, you know, about having rights and everything else," that observation sets the bar far too low. A relatively unsophisticated young man was misled by false promises to confess his direct involvement in a gang-related shooting. It was the People's burden to rebut the presumption that Arevalo's second confession was the product of that improperly obtained first one by establishing a break in the causative chain between the two statements. (*McWhorter, supra*, 47 Cal.4th at p. 359.) They failed to do so. In a retrial both statements must be excluded.

     5. *Substantial Evidence Supports Vargas's and Arevalo's Murder Convictions*

     Although we reverse Vargas's and Arevalo's murder convictions because of instructional error and, as to Arevalo, the improper admission into evidence of his involuntary confession, we must also evaluate their claim those convictions, as tried, are not supported by substantial evidence. "The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." (*Burks v. United States* (1978) 437 U.S. 1, 11 [98 S.Ct. 2141, 57 L.Ed.2d 1].) To avoid placing a defendant in double jeopardy, a

reviewing court that reverses a conviction due to legal error must assess the defendant's challenges to the sufficiency of the evidence to determine whether the defendant may be retried for some or all of the offenses. (See *People v. Morgan* (2007) 42 Cal.4th 593, 613; *People v. Hayes* (1990) 52 Cal.3d 577, 631.) "[T]he defendant . . . may preserve for himself whatever double jeopardy benefits accrued in his first trial notwithstanding some fatal defect in the proceedings." (*People v. Superior Court (Marks)* (1991) 1 Cal.4th 56, 72, fn. 14.)

In considering a claim of insufficient evidence in a criminal case, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; accord, *People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

The evidence presented to the two juries was sufficient to support the murder verdicts as to both defendants under legally correct theories of guilt. As discussed, prior to the shooting Vargas and Arevalo, both members of the Mara Salvatrucha gang, met with Listo, another Mara Salvatrucha gang member, outside Vargas's home. Rival gang

members from Rebels 13 had been marking graffiti near Vargas's home, which was claimed by Mara Salvatrucha as part of their territory. When Listo arrived, he told them he had a gun with him (and according to Arevalo showed them the firearm) and wanted to look for rival gang members. The three young men then began slowly moving through the neighborhood—Vargas and Arevalo on their bicycles; Listo walking closely behind them. (In his closing argument the prosecutor described this behavior as trolling—acting in a deliberately provocative manner with Arevalo, the smallest of the three, serving as bait.) The juries could reasonably infer from this evidence that Vargas and Arevalo, knowing Listo was armed, planned to assist him in an effort to locate and kill a rival gang member to protect Mara Salvatrucha territory and that Rodriguez, who had the appearance of a gang member and challenged Vargas and Arevalo, was identified by the three MS gang members as an appropriate target of the plan. That conclusion is reinforced by the identification of the Mara Salvatrucha gang during the confrontation with Rodriguez, as well as the three men's immediate flight from the scene of the shooting with Listo riding on the back of one of the two bicycles and their meeting shortly thereafter at Argueta's house, a Mara Salvatrucha gathering spot, where they remained off the streets and hidden until after nightfall.

6. *The Trial Court Used the Proper Procedure in Reviewing Information Responsive to the Pitchess Motion*

Prior to trial Arevalo moved under Evidence Code section 1043 and *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 for a review of Detective Goodkin's personnel records. The trial court reviewed the requested records in camera and found no discoverable information although it did order information regarding a "Brady incident"[11] to be turned over to defense counsel. (Detective Goodkin had lied to his superiors about his paid involvement in a motion picture concerning one of his cases.) At Arevalo's request, which the People do not oppose, we have reviewed the sealed record of the in

---

[11] *Brady v. Maryland* (1963) 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] requires the prosecution to disclose material exculpatory evidence to the defense.

camera proceedings and conclude the trial court satisfied the minimum requirements in determining whether there was discoverable information. No abuse of discretion occurred. (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1225.)

7. *The Trial Court Properly Denied the Request To Disclose the Identity of the Confidential Informants*

Within a few weeks of Rodriguez's shooting detectives interviewed a confidential informant, purportedly a Mara Salvatrucha gang member, who reported that Listo had been bragging he had killed a rival gang member. As a result of this information detectives recovered the gun Listo had used to kill Rodriguez. Several months later detectives interviewed a second confidential informant, another Mara Salvatrucha gang member, who identified Vargas, Arevalo and two other gang members as being present at the time of the shooting. This informant also told the detectives Arevalo knew Listo was carrying a gun before the incident and Listo gave Arevalo the gun to hold for at least a brief time after the shooting.

Defense counsel moved pursuant to Evidence Code sections 1041 and 1042 to disclose the identities of the confidential informants. An in camera hearing was held, as authorized by Evidence Code section 1042, subdivision (d), at which Detective Goodkin testified. The court denied the request for disclosure, finding that nondisclosure would not deprive Vargas and Arevalo of a fair trial.[12]

"[T]he prosecution must disclose the name of an informant who is a material witness in a criminal case or suffer dismissal of the charges against the defendant.

---

[12] When a party demands disclosure of an informant's identity, Evidence Code section 1042, subdivision (d), requires the court to conduct a hearing "at which parties may present evidence on the issue of disclosure." However, if the identity of the informant could be compromised by such a hearing, "the prosecuting attorney may request that the court hold an in camera hearing. If such a request is made, the court shall hold such a hearing outside the presence of the defendant and his counsel. At the in camera hearing, the prosecution may offer evidence which would tend to disclose or which discloses the identity of the informant to aid the court in its determination whether there is a reasonable possibility that nondisclosure might deprive the defendant of a fair trial." (*Ibid.*)

[Citation.] An informant is a material witness if there appears, from the evidence presented, a reasonable possibility that he or she could give evidence on the issue of guilt that might exonerate the defendant." (*People v. Lawley* (2002) 27 Cal.4th 102, 159; accord, *Davis v. Superior Court* (2010) 186 Cal.App.4th 1272, 1276.)

Arevalo and Vargas have requested this court review the sealed transcript of the in camera hearing to determine whether the trial court correctly applied the standard governing disclosure of the informants' identities. The Attorney General agrees an independent review of the sealed transcript is appropriate.

We have conducted the requested review. The record demonstrates the court employed the proper procedure and had sufficient information to determine the informants were not material witnesses. There was no abuse of discretion.

8. *The Challenge to Arevalo's Indeterminate Life Sentence Is Moot*

In a supplemental opening brief Arevalo contends his sentence of 40 years to life for second degree murder plus the gang/firearm-use enhancement was a de facto sentence to life without the possibility of parole[13] and, because he was only 16 years old at the time of the offense, argues that sentence violates the Eighth Amendment prohibition on cruel and unusual punishment and the proscription in article I, section 17 of the California Constitution of cruel or unusual punishment under the principles announced in *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455, 183 L.Ed.2d 407], *People v. Gutierrez* (2014) 58 Cal.4th 1354 and *People v. Caballero* (2012) 55 Cal.4th 262. In response the Attorney General contends the sentence imposed is not the functional equivalent of life without the possibility of parole because the minimum portion of the indeterminate term does not exceed Arevalo's natural life expectancy and, in any event, pursuant to Penal Code section 3051, subdivision (b)(3), he will receive a parole suitability hearing during his 25th year of incarceration.

---

[13] Citing to final data for 2010—the year Rodriguez was shot and killed—in the National Vital Statistics Report from the United States Centers for Disease Control and Prevention, Arevalo states the life expectancy for a 20-year-old Hispanic male was 59.3 years.

The constitutionality of Arevalo's sentence is moot in light of our reversal of his conviction for second degree murder.  Moreover, even though a similar sentencing issue could arise if Arevalo is convicted of murder with related gang and firearm-use enhancements following a new trial, it is likely the Supreme Court will resolve the two fundamental questions presented by Arevalo in the near future.  In *In re Alatriste* (S214652, rev. granted Feb. 19, 2014) and *In re Bonilla* (S214960, rev. granted Feb. 19, 2014) the Supreme Court will consider when an indeterminate life sentence with the possibility of parole after the defendant has served a significant minimum term becomes the functional equivalent of life without the possibility of parole and whether Senate Bill No. 260 (Reg. Sess. 2013-2014), which added Penal Code section 3051 providing for a parole suitability hearing after a maximum of 25 years for most juvenile offenders serving life sentences, moots any claim that such a sentence violates the Eighth Amendment.  Both cases are now fully briefed and awaiting oral argument.  The answers to those questions, therefore, will likely be available to the trial court before any further sentencing hearing takes place.

## DISPOSITION

The judgments are reversed, and the cause remanded for new trials and for further proceedings not inconsistent with this opinion.

PERLUSS, P. J.

We concur:

ZELON, J.                IWASAKI, J. [*]

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.